`

# EXHIBIT 1

1 | Vatché Chorbajian, Esq. (SBN. 134271)
2 | Email: vatche@vclegal.com
  | Alain Chorbajian, Esq. (SBN. 323199)
3 | Email: alain@vclegal.com
  | Chandler Michelotti, Esq. (SBN. 343895)
4 | Email: chandler@vclegal.com
5 | John Chorbajian, Esq. (SBN. 349558)
  | Email: john@vclegal.com
6 | **Law Offices of Vatché Chorbajian, APC**
  | 5531 Cancha De Golf, #107
7 | Rancho Santa Fe, CA 92091
8 | Telephone: (858) 227-7299
  | Facsimile: (858) 923-2124
9 |
10 | Attorneys for Plaintiff,
   | Kenneth Solomon
11 |

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/22/2025 1:41 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Sam, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

KENNETH SOLOMON, an individual,

      Plaintiff,

v.

THE TENNIS CHANNEL, LLC, a
Delaware limited liability company;
THE TENNIS CHANNEL, INC., a
Delaware corporation; THE TENNIS
CHANNEL HOLDINGS, INC., a
Delaware corporation; SINCLAIR,
INC., a Maryland corporation;
SINCLAIR BROADCAST GROUP,
INC., a Maryland corporation;
SINCLAIR BROADCAST GROUP,
LLC, a Maryland limited liability
company; SINCLAIR TELEVISION
GROUP, INC., a Maryland corporation;
WILLIAM SIMON, an individual;
ROBERT WEISBORD, an individual;
CHRISTOPHER RIPLEY, an

CASE NO: 25SMCV04406

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

COMPLAINT

1  individual; and DOES 1 through 20
2  inclusive,

3          Defendants.

4

5      Plaintiff Kenneth Solomon brings this action against Defendants The Tennis

6  Channel, LLC, , The Tennis Channel, Inc., The Tennis Channel Holdings, Inc.,  Sinclair,
7
8  Inc., Sinclair Broadcast Group, Inc., Sinclair Broadcast Group, LLC, Sinclair Television

9  Group, Inc., (collectively "Corporate Defendants"), William Simon, Robert Weisbord,

10 Christopher Ripley, , and DOES 1 through 20, inclusive, for wrongful termination in
11
12 violation of public policy, breach of contract, breach of implied covenant of good faith and

13 fair dealing, violations of the California Labor Code, and defamation.

14                          **PRELIMINARY STATEMENT**

15     1.     For nearly twenty years, Plaintiff Kenneth Solomon was the face, Chairman,
16
17 CEO and then President of the Tennis Channel, leading the independent cable television

18 channel and multi-platform media brand to industry-leading growth and unparalled success.

19 In addition to being the driving force of the Tennis Channel, Plaintiff was the embodiment

20 of the network and the creator and indefatigable force behind its existence and success.

21 Within the overall sports media world there was consensus that the Tennis Channel
22
23 contributed significantly to the growth of tennis, by providing access to viewing of all

24 professional tennis events 24/7 from across the globe for the first time ever.  In addition to

25 its position as the worldwide media home of tennis, the company under Plaintiff was
26
27 recognized as a cutting-edge innovator in advancing the business of sports media and new

28 technology.

                                   COMPLAINT

2.      Since professional tennis is a global sport with one to three weeklong events stated continuously from January through December every year, cutting across time zones, Plaintiff was expected to, and in fact did, make monumental personal sacrifices through tireless travel and face-to-face meetings, building relationships with advertisers, sponsors, tournament owners, officials, players, and fans.  These efforts took place for over twenty years as Plaintiff pursued his mission of building an enduring sports entertainment company.

3.      Plaintiff's dedication to Tennis Channel never wavered, even when the relationship with certain Sinclair executives began to sour and even devolved into blatant sabotage. Despite being betrayed, undermined, conspired against, and inexplicably defamed, Plaintiff made repeated offers to complete the sale of Tennis Channel, as he had been tasked to do.

4.      Despite Plaintiff's herculean efforts and continually successful entrepreneurial feats for Tennis Channel and Sinclair, Plaintiff was wrongly ousted from the empire he built, one which Sinclair and its owners have derived great reputational and financial benefit. The only plausible rationale is that Plaintiff's termination for "cause" was fabricated to deprive him of the fruits of his labor and to avoid paying him earned options, bonuses and/or termination payments.

5.      In an effort to bolster their bogus narrative, Defendants willfully disparaged and defamed Plaintiff in violation of his Employment Agreement and the law.

**PARTIES**

6.      Plaintiff Kenneth Solomon ("Plaintiff") is a former resident of Riverside

County, California who now resides in Texas as of 2025.

7.      Defendant The Tennis Channel, LLC ("TCLLC") is a Delaware limited liability company doing business in California with its principal place of business in Santa Monica, California.

8.      Defendant The Tennis Channel, Inc. ("TCI") is a Delaware corporation doing business in California with its principal place of business in Santa Monica, California.

9.      Defendant The Tennis Channel Holdings, Inc. ("TCHI") is a Delaware corporation doing business in California with its principal place of business in Santa Monica, California. Defendant TCHI is a wholly owned subsidiary of Defendant STG.

10.     Defendant Sinclair, Inc. ("Sinclair") is a Maryland corporation doing business in California with a principal place of business in Hunt Valley, Maryland. In or about June of 2023, Defendant Sinclair became the new public holding company of Defendant SBG in a share exchange.

11.     Defendant Sinclair Broadcast Group, Inc. is a Maryland corporation doing business in California with its principal place of business in Cockeysville, Maryland. In or about May of 2025, Defendant Sinclair Broadcast Group, Inc. converted into a Maryland limited liability company, namely Defendant Sinclair Broadcast Group, LLC, which does business in California with its principal place of business in Hunt Valley, Maryland. Defendant Sinclair Broadcast Group, Inc. and Defendant Sinclair Broadcast Group, LLC are collectively referred to herein as "SBG".

12.     Defendant Sinclair Television Group, Inc. ("STG") is a Maryland corporation doing business in California with a principal place of business in Cockeysville, Maryland.

COMPLAINT

1    Defendant STG is a wholly owned subsidiary of Defendant SBG.

2        13.    Defendant William Simon was, at all relevant times, the Chief Financial

3
     Officer at the Tennis Channel and a resident of Santa Monica, California.
4

5        14.    Defendant Robert Weisbord was, at all relevant times, the Chief Operating

6    Officer and President at SBG and a resident of Nevada.

7        15.    Defendant Christopher Ripley was, at all relevant times, the Chief Executive

8
     Officer at Sinclair and a resident of Maryland.
9

10       16.    Plaintiff is unaware of the true names and capacities of defendants DOES 1

11   through 20, inclusive, and therefore Plaintiff sues these fictitious names. Plaintiff is

12   informed and believes, and on that basis alleges, that each of the fictitiously named

13
     defendants is in some manner responsible for the damages that Plaintiff has alleged in this
14

15   Complaint. Plaintiff will amend this Complaint to show the true names and capacities of

16   these fictitiously named Defendants after their true names and capacities have been

17   ascertained.

18
         17.    Plaintiff is informed and believes that, at all times herein mentioned, each of
19

20   the Defendants, including the fictitious DOE defendants, are the agent, successor, alter ego,

21   wholly owned subsidiary, and/or employee of each of the remaining Defendants and in

22   doing the things mentioned herein was acting within the scope of such relationship. Plaintiff

23
     is informed and believes and based thereon alleges that all Defendants, and each of them,
24

25   were and are the agents, servants, employees, joint ventures, and/or partners of each of the

26   other Defendants, and were, at all such times, acting within the course and scope of said

27   employment and/or agency; furthermore, that each and every Defendant herein, while

28

                                    COMPLAINT

1    acting as a high corporate officer, director and/or managing agent, principal and/or

2    employer, expressly directed, consented to, approved, affirmed and ratified each and every

3    action by the other co-Defendants, as herein alleged and was responsible in whole or in part

4

5    for the matters referred to herein.

6        18.    Plaintiff is informed and believes and based thereon alleges that Defendants,

7    and each of them, are now and/or at all times mentioned in this Complaint were, members

8    of and/or engaged in a joint venture, partnership and common enterprise and, as such were

9

10   co-employers or joint employers of Plaintiff.

11       19.    Plaintiff is informed and believes and based thereon alleges that Defendants,

12   and each of them, at all times mentioned in this Complaint, concurred with, contributed to,

13   approved of, aided and abetted, condoned and/or otherwise ratified, the various acts and

14

15   omissions of each and every one of the other Defendants in proximately causing the injuries

16   and/or damages alleged in this Complaint.

17       20.    Plaintiff is informed and believes, and therefore alleges, that each Defendant

18   is liable to Plaintiff under legal theories and doctrines including but not limited to, (1) joint

19

20   employer; (2) integrated enterprise; (3) single enterprise; (4) agency; (5) successor liability;

21   and/or (6) alter ego, based on the facts set forth below.

22                            **JURISDICTION AND VENUE**

23       21.    The Court has subject matter jurisdiction to hear this case. The monetary

24   damages sought herein for Defendants' conduct exceed the minimum jurisdictional limits of

25

26   the Superior Court. The acts and omissions took place, in whole or in part, within the State

27   of California, and at least one Defendant resides in California.

28

COMPLAINT

1    22.    Venue is proper in Los Angeles County pursuant to Code of Civil Procedure

2    §§ 395(a) and 395.5 because Sinclair and Tennis Channel maintain offices and transact

3
4    substantial business in Los Angeles County, employed Plaintiff in Los Angeles County, and

5    the unlawful acts alleged herein that arose in Los Angeles County had and continue to have

6    a direct effect on Plaintiff within Los Angeles County.

7                               **GENERAL ALLEGATIONS**

8
9    **Plaintiff's History with Tennis Channel**

10    23.    Tennis Channel was established in 2003 by a group of credible investors (Bain

11   Ventures, Columbia Capital, Battery Ventures, JP Morgan, Frank Biondi, Philipe Dauman,

12   Tom Dooley, and other industry leaders) looking to build out a national cable sports network

13
14   with tennis and a broad range of racquet sport-related programming. Tennis Channel raised

15   significant funds from investors but struggled when it initially launched and achieved no

16   sizable distribution.

17    24.    On the brink of extinction, Tennis Channel brought in Plaintiff in 2005 as the

18   Chairman and Chief Executive Officer to save the venture by restructuring and

19
20   reengineering the network and the overall brand.

21    25.    Independent networks were no longer being successfully launched because of

22   the gatekeeping control of national distribution by the major "pay TV" distributors (i.e.

23
24   Multichannel Video Programming Distributors ("MVPDs"), cable, satellite, telephony, etc.),

25   primarily because these major players were incentivized to only provide and pay license fees

26   for carriage to their owned networks. Plaintiff led the breakthrough anti-discrimination fight

27   against the industry's largest cable/media conglomerate on behalf of all independent

28

networks, leading a seven-year David and Goliath battle through the FCC, and ultimately to the U.S. Supreme Court. This fight was the first and only successful lawsuit seeking enforcement of the Cable Television Consumer Protection and Competition Act of 1992, prohibiting MVPDs from favoring their own affiliated networks over independently owned program services.

26.    Making the feat of building an independent tennis network even more difficult, the tennis world is composed of hundreds of individual, worldwide, simultaneously overlapping tennis global rights holders, (e.g. leagues, governing bodies, tournaments, national associations, etc.), who consider themselves competitors. Plaintiff's efforts resulted in sports media's, not just tennis', first ever "roll-up" of the vast majority of any single sports total rights portfolio on one media platform. This comprehensive lineup composed of a sports-industry leading thousands of hours of live year-round, daily tennis telecast rights, included coverage of every ATP men's and WTA women's tours matches, rights to coverage of all four grand slams, as well as the Davis, Billie Jean King, and Rod Laver Cups. Tennis Channel's total annual combined live rights telecasts surpassed all other single and multi-sport networks.

27.    As a result of Plaintiff's efforts, Tennis Channel's fortunes were reversed, and while the traditional television and pay TV businesses were contracting, Tennis Channel experienced significant growth in distribution, revenue, and national viewership. As importantly, the Tennis Channel led the sport's media fortunes to new heights, benefitting virtually every stakeholder, from events to players, and effectively serving as the sport's de facto unifying league in media.

**Sinclair Acquires Tennis Channel**

28.     In the decade plus leading up to Sinclair's acquisition of the Tennis Channel in 2016, Plaintiff continued to build and shepherd the Tennis Channel into a period of substantial growth and viewership. Plaintiff was constantly looking for ways to grow and innovate the Tennis Channel, and he viewed Sinclair as a potential partner in achieving such growth.

29.     Since Plaintiff had a longstanding relationship with David Smith, Plaintiff personally approached Smith about the potential for a mutually beneficial distribution partnership between Tennis Channel and Sinclair.  With Sinclair's local broadcast industry losing value daily, Tennis Channel represented a uniquely powerful growth strategy through unlocking the value of Sinclair's broadcast footprint. Having considered Plaintiff's proposal, Smith returned with one of his own: instead of a partnership, Sinclair would buy Tennis Channel outright to capture the full upside potential of Solomon's strategy. Tennis Channel's substantial growth and viewership was appealing to Sinclair.  Impressed with this singular opportunity, and excited by the potential for continued and even accelerated growth, Sinclair ultimately purchased Tennis Channel for $350 million.

30.     During a Saturday morning pre-purchase meeting, in response to Smith's request for Plaintiff's long-term personal commitment, Plaintiff reminded Smith that while he was eager to continue leading the company, he also had many outside interests which he intended to continue, including active TV and movie development projects, non-competitive board memberships; publicly-traded Live-X-Live (music and video based media); independent cable channels Fuse Network; Chairman of the Board of Ovation Network, and

multiple other political and philanthropic involvements. Smith's response was simple and straightforward, "You can do whatever you want, as long as it doesn't impact your performance running the Tennis Channel."

31.   In connection with the acquisition, Plaintiff agreed to enter into the Agreement with Sinclair to serve as President of Tennis Channel. In recognition of Plaintiff's inextricably intertwined value with the brand, the purchase was conditioned on Plaintiff's continuing leadership of the company. Before closing, Smith told Plaintiff "I am buying you," and "there is no Tennis Channel without you." "I want you here forever."

32.   Prior to the close of the deal, Plaintiff raised concerns about a cultural mismatch between Tennis Channel and Sinclair, as Tennis Channel is comprised of entrepreneurial, agile, growth-oriented innovators, and Sinclair is the exact opposite. In response to Plaintiff's concerns, Smith said, "I agree. Keep us out of your business. We don't know your business. Make sure you keep us out, so we don't ruin it." This was a familiar refrain óver Plaintiff's entire tenure.

**Key Terms of Plaintiff's Employment Agreement**

33.   In January 2016, Corporate Defendants entered into an Employment Agreement ("Agreement") with Plaintiff under which Plaintiff continued to work in the same role as President of Tennis Channel after the acquisition. **Exhibit A** attached hereto.

34.   The Agreement identifies Plaintiff's employer as Tennis Channel, Inc. However, it is signed by The Tennis Channel Holdings, Inc. (erroneously referred to as The Tennis Channel Holding Company, Inc.) on behalf of itself and its wholly owned subsidiary Tennis Channel, Inc.

35.     The Agreement also states that STG and SBG will be referred to in the Agreement as a "Party" or "Parties" to the Agreement.

36.     Section 1.1 of the Agreement provides that, as part of Plaintiff's duties, he will report to the President and CEO of SBG and that there will not be a CEO of TCI other than the CEO of SBG. This section also provides that Plaintiff's duties will be assigned by the TCI's Board of Directors ("TCI Board") and/or the President and CEO or CFO of SBG.

37.     Section 1.2 of the Agreement provides:

*Full-Time Employment.*  Employee agrees to devote Employee's full working time, attention, and best efforts exclusively to the business of the Employer and its direct and indirect subsidiaries; provided, however, so long as such activities, either individually or in the aggregate, do not interfere with the performance of Employee's duties hereunder as determined by the TCI Board in its reasonable discretion, Employee shall be permitted (1) to continue to serve as non-executive chairman of the board of directors of the cable television channel currently known as Ovation ("Ovation"), and (ii) to serve on civic, educational, charitable, professional, governmental or religious boards or committees, or any other board of directors provided Employee receives prior approval from the TCI Board of Directors. In the event the [sic] SBG desires the employee to render services beyond the scope of TCI's tennis business, Employer and Employee will negotiate in good faith for additional incentive compensation to Employee.

38.     Section 1.3 of the Agreement provides:

*Location.*  During the Employment Term, Employee's services under this Agreement shall be performed principally at the headquarters of the Channel which are presently located in Santa Monica, CA and shall continue to be located within Los Angeles County, The parties acknowledge and agree that the nature of Employee's duties hereunder shall, in any event, require reasonable travel from time to time consistent with travel obligations inherent with the title, duties, and responsibilities of the Employee or as may be from time to time reasonably directed by the TCI Board or the President and CEO of SBG.

39. Under Section 3.1 of the Agreement, Plaintiff was entitled to a salary plus a Performance Bonus up to an amount equal to 100% of his base salary, as well as an additional Incentive Bonus.

40. Section 4.1 of the Agreement provides that the Employment Term ends on the earliest of the following events: (1) the death of Employee; (2) the Employee's disability; (3) upon providing notice to the Employer, termination by Employee without Good Reason; (4) upon providing Notice to Employee, termination for Cause; (5) upon providing Notice to Employee, termination without Cause; and 6) termination by Employee for Good Reason.

41. Section 4.1(c) of the Agreement defines "Cause" as including the following:

> (i) the wrongful appropriation for Employee's own use or benefit of property or money entrusted to Employee by Employer, or the Employer or its direct or indirect subsidiaries or parents, (ii) the conviction or granting of a Probation Before Judgment (or similar such finding or determination if not by a Maryland court) of a felony involving moral turpitude, deceit, or fraud, (iii) Employee's continued willful disregard of Employee's duties and responsibilities hereunder after written notice of such disregard and the reasonable opportunity to correct such disregard, (iv) Employee's continued violation of Employer policy after written notice of such violations (such policy may include policies as to drug or alcohol abuse) and the reasonable opportunity to cure such violations, (v) any misconduct or negligence by Employee which is reasonably likely (in the opinion of Employer's outside Corporate or Securities counsel) to directly or indirectly jeopardize or adversely affect any of STG's or SBG's public or private financings or the public registration of any applicable STG, or SBG capital stock or debt; (vi) the continued insubordination of Employee and/or Employee's repeated failure to follow the reasonable directives of the Employer, the President and CEO of SBG, or the TCI Board after written notice of such insubordination or the failure to follow such reasonable directives.

42.     Under Section 4.2 of the Agreement, a termination for "Cause" requires Sinclair to pay Plaintiff the pro rata portion of Plaintiff's base salary due at the date of termination. A termination without "Cause" (or a resignation with Good Reason) requires Sinclair to pay Plaintiff the pro rata portion of Plaintiff's base salary with respect to the current year, any accrued but unused vacation time, a separation payment equal to Plaintiff's base salary and the annual Performance Bonus target, and the payment of any Incentive Bonus.

43.     Under Section 5.3 of the Agreement:

> Each Party agrees and covenants that they will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the other Party (and in the case of TCI and TCHI its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors, direct and indirect owners, and other associated, affiliated, and related third parties).

44.     Under Section 8.2 of the Agreement, Plaintiff was generally entitled to an Incentive Bonus equal to: One and ninety-six hundredths percent (1.96%) of the difference between (i) eight (8) times EBITDA for the calendar year with respect to which such Incentive Bonus is being paid (the "Value Amount"), and (ii) eight (8) times EBITDA for the calendar year immediately prior to the calendar year with respect to which such Incentive Bonus is being paid.

45.     Section 8.2 further provides that the EBITDA for all years (and partial years) applicable to the calculation of any incentive Bonus shall be reduced by the Sinclair Effect. The "Sinclair Effect" is defined under Section 8.1(b) of the Agreement, and it is

essentially a variable that Sinclair can manipulate however it sees fit to deny Plaintiff the full value of the incentive bonuses he and others would otherwise be owed.

46.    Section 8.3 of the Agreement provides:

> Except as provided in Section 8.5, the first annual Incentive Bonus will be paid, if any, on the date which is four (4) years following the end of the first calendar year for which such Incentive Bonus is computed and each other annual Incentive Bonus will be paid if any, on the date which is three (3) years following the end of the calendar year for which such Incentive Bonus is computed, provided that Employee is still employed by TCI on the date on which such Incentive Bonus is payable. For example, the Incentive Bonus payable for the 2017 calendar year, if any, will be paid on December 31, 2021 (assuming such year is the first year for which such Incentive Bonus is computed) if Employee is still employed by TCI on December 31, 2021 and the Incentive Bonus payable for the 2018 calendar year, if any, will be paid on December 31, 2021 if Employee is still employed by TCI on December 31, 2021. The Parties agree that, except as otherwise provided in Section 8.5, continued employment through the date on which any Incentive Bonus is payable is a condition precedent of such Incentive Bonus actually being earned.

47.    These incentive bonuses were referred to as a long-term incentive plan ("Agreement LTIP").

**Plaintiff Continues to Grow Tennis Channel**

48.    For over eight years with Sinclair, Plaintiff worked tirelessly, on call 24/7, 365 days a year to drive up Tennis Channel's value. He did so at great personal cost in terms of health, marriage, family and life quality all driven by the concept and belief in "delayed gratification." Work hard now, build this network into a compelling force in the market, and reap the shared rewards in the end as promised.

49.    Plaintiff's role was never a desk job, nor could it be. More often than not, Plaintiff

1  worked out of a suitcase, not an office. Indeed, Plaintiff was physically present at every

2  major tennis tournament year after year. This created value at great personal cost. This

3  presence at all events was necessary to get many of the rights, sponsorship, talent and player

4

5  deals done.

6      50.    Plaintiff's duties were all-encompassing. They included running the day-to-day

7  operations of Tennis Channel, maintaining critical external relationships, and traveling

8  extensively to negotiate valuable international distribution deals for the network. Plaintiff

9

10  would often, at Sinclair's behest, provide connections and make business introductions that

11  Sinclair would otherwise not have had. It was well known that Plaintiff had a reach into

12  spaces and industries in which Sinclair had no impact or presence, and Sinclair would use

13

14  Plaintiff's connections for its *own* benefit.

15      51.    Plaintiff's results for Sinclair speak for themselves and represent a bright spot in

16  what was otherwise a distressed period for Sinclair and the industry. At the time of purchase

17  in 2016, Tennis Channel EBITDA was $17.5 million, and Tennis Channel was available in

18

19  35 million homes in the United States.

20      52.    In 2024, Tennis Channel's projected EBIDTA was over $135 million, and Tennis

21  Channel was available in 37 million homes in the United States. In the last five years,

22  Tennis Channel's ratings doubled, despite a contracting market and the interference and

23

24  failures by Sinclair. Moreover, if not for Plaintiff's business acumen and singular vision,

25  Tennis Channel would have lost valuable rights and distribution deals, such as the WTA

26  and Roland-Garros French Open, impacting its revenue, visibility, credibility, and ability

27  to maintain top on-air talent.

28

53.    At the Tennis Channel's peak, Plaintiff grew the Tennis Channel to astounding numbers where it was available in nearly 60 million homes in the United States. From an international standpoint, the Tennis Channel launched in 11 countries and was even available via a direct-to-consumer platform, all of which was at Plaintiff's behest.

54.    These achievements were neither obtained by accident nor were they the result of clear and fully expected demands and instruction received from David Smith and the Sinclair Board. Rather, this was a relationship-driven enterprise and Plaintiff was the designated persona of Tennis Channel. He made it clear, and it was understood by all, that this was neither a "paper process," nor was it an electronic process to be conducted by phone or computer. This was to be an "eye-contact," face-to-face, time invested, trust building, shoulder to shoulder problem-solving and joint value building partnership with tournament owners, players, advertisers, sponsors, governing bodies, actual governments, local politicians and philanthropies leveraging Plaintiff's personal reputation built over his entire career.

55.    In light of Tennis Channel's continued success, Plaintiff earned the maximum Performance Bonus (under Section 3.1 of the Agreement) during each calendar year.

**Sinclair Experiences a Distressed Period**

56.    While Tennis Channel was growing and defying expectations under Plaintiff's leadership, and increasingly paying Sinclair's other bills, Sinclair otherwise went through a continuing series of distressed periods. Most notably, Sinclair squandered the opportunity to acquire Tribune Media and to become the country's biggest television broadcaster. Sinclair also became the subject of multiple government investigations, resulting in Sinclair

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

having to pay the largest civil penalty involving a broadcaster in the amount of $48 million in the Federal Communications Commission's history.

57.    In contrast to the usual situation where the bigger parent company provides resources in order for the subsidiary to grow, the reverse was true with Sinclair and Tennis Channel. The Tennis Channel's profits and Plaintiff's major ideas and implemented growth initiatives (including two new 24/7, 365 days a year free ad-supported streaming television channels (FAST), T2, being a second, all-original new tennis channel, PickleballTV, being the first and only channel dedicated to the number one fastest growing global sport, international distributions, podcasting, and online sports betting) subsidized Sinclair's failures.

58.    Indeed, even beyond finances, Sinclair would commonly raid Tennis Channel ranks to fill key Sinclair corporate positions (many of which were filled by professionals that Plaintiff recruited, trained, or hired) and Sinclair would take distribution and earned investment capital away from Tennis Channel and give it to other, failing broadcast businesses.

59.    Further, Diamond Sports Broadcaster ("Diamond"), Sinclair's regional sports broadcaster, filed for bankruptcy in March 2023. Then, in or around August 2023, Diamond sued Sinclair for $1.5 billion in connection with Sinclair illegally siphoning Diamond's assets for its own enrichment. *See* Complaint, *Diamond Sports Group, LLC v. Sinclair Broadcast Group, Inc.*, Case No. 23- 03134 (Bankr. S.D. Tex. August 16, 2023) (explaining Sinclair's nefarious plan in the words of David Smith to "milk" Diamond and then to "file for bankruptcy.").

60.    The Diamond case created an urgent need for cash and necessitated a sale of Sinclair's "crown jewel," being Tennis Channel. Sinclair eventually settled the Diamond lawsuit for a jaw-dropping $495 million.

**Modification of the LTIP Provision in the Employment Agreement**

61.    In or around late December 2021, Sinclair proposed to modify the Agreement LTIP. Throughout December 2021 and January 2022, Sinclair negotiated with Plaintiff over the modification of the Agreement LTIP.

62.    In or around January 2022, Sinclair and Plaintiff agreed to modify the Agreement LTIP ("Modified LTIP"). Under the Modified LTIP, in exchange for what he was owed under the Agreement LTIP, Plaintiff would receive phantom equity options.

63.    Sinclair would cash out and retire fifty percent of Plaintiff's options at a value of $3.86 million. Plaintiff would then receive the remaining 50% of his options, which were considered earned, over a period of three years from December 31, 2022, to December 31, 2025. The intent was for the Modified LTIP to replace the Agreement LTIP.

64.    The Modified LTIP's terms were unfair to Plaintiff, but the parties entered into the Modified LTIP based on the representation by Sinclair that it would in good faith sell Tennis Channel.

**Plaintiff Requests to Join the Board of Merit Street Media**

65.    Throughout Plaintiff's term of employment, he was involved with many boards and outside business interests, including three other non-competitive independent cable networks, and public companies, all of which were approved and never impacted the performance of Plaintiff's duties to Tennis Channel, nor were there any concerns. To the

contrary, Plaintiff's approved external activities further bolstered Tennis Channel's visibility, built stellar partnerships, and contributed to corporate synergy.

66.    In or around the fourth quarter of 2023, Plaintiff requested to join as advisor and the board of directors of Merit Street Media, a new independent television network founded by Phil McGraw ("Dr. Phil") based in Texas that launched in April of 2024.

67.    Plaintiff's request was approved in writing.

**Efforts to sell Tennis Channel**

68.    In or around mid-2023, Smith abruptly told Plaintiff that he wanted Plaintiff to be traveling, focusing on building what Smith referred to as "enterprise value," and then later selling Tennis Channel. Additionally, because he wanted Plaintiff to focus on the sale process, Smith indicated that he wanted Plaintiff to relinquish all day-to-day Tennis Channel management activities, have all of Tennis Channel's daily operations to now run through Bill Simon, Tennis Channel's then-Chief Financial Officer and Chief Operating Officer, and to have Simon report to Rob Weisbord, Sinclair's Chief Operating Officer and President of Local Media.

69.    Sinclair also carved out Tennis Channel's financials on Sinclair's quarterly financial results for investors and the market to see Tennis Channel's success, and in preparation for sale. Sinclair would highlight Tennis Channel's accomplishments in investor presentations and Board meetings, many of which Plaintiff presented.

70.    In many of these presentations and meetings, while in the presence of Sinclair executives and bankers, potential investors asked Plaintiff about his future involvement with Tennis Channel. At all times, Plaintiff unequivocally stated that he was eager to be

part of Tennis Channel going forward, no matter who the future owner was. Sinclair never confronted or challenged Plaintiff, and never corrected his statements to investors, thus ratifying Plaintiff's assertion.

71.   At Sinclair's behest, Plaintiff singlehandedly shouldered the burden of leading Tennis Channel's sale process and continued traveling the world to build value and market Tennis Channel to potential buyers.

72.   For nearly a year up until his last day, Plaintiff led Sinclair's efforts to sell Tennis Channel, all while still busily running Tennis Channel. Among other things, he sourced leads, met with bankers and prospective investors, and traveled all over the world to pitch Tennis Channel to potential buyers, arranging, scheduling and attending dozens of meetings.

73.   In connection with the competitive bid process, in July 2024, potential bidders requested that Sinclair build out disclosure schedules to accompany any transaction agreement. Specifically, Sinclair had to disclose any phantom interests, which included the remaining fifty percent of Plaintiff's previously earned phantom equity options under the Modified LTIP. Ultimately, Sinclair disclosed the Modified LTIP to potential buyers.

74.   During the last year Sinclair claims Plaintiff abandoned the company, in addition to selling the company he launched a new direct to consumer arm, launched more international global distributions, invented and created Pickleball TV, helped design and close a key distribution deal with the cable world's #1 Charter TV and a similar deal with top VMVPD Hulu, and led a Sinclair corporate and Tennis Channel executive team in an attempt to purchase the world's largest online e-tailer TennisPoint. Plaintiff even

crisscrossed the globe to close a highly contested long-term renewal for the network's largest and most important single-rights deal, being the ATP men's professional tennis tour rights extension through 2030, all while gearing up the sale.

75.    In or around 2024, in anticipation of a pending sale, the Modified LTIP was modified again to provide Plaintiff, among other things, an additional $1 million in the event of a sale of Tennis Channel or any portion of The Tennis Channel that has Tennis Channel's full valuation at $1 billion or more.

76.    Plaintiff's efforts resulted in various purchase offers, with several offers valuing Tennis Channel at over one billion dollars. When presented with these offers, Smith, who is also Sinclair's largest shareholder, decided to reject the offers and not to pursue the sale any further.

**Pretextual Reasons Devised to Terminate Plaintiff**

77.    In or about mid-2024, contrary to Smith's earlier directive, Ripley demanded that Plaintiff be physically present at Tennis Channel headquarters in California five days a week, with the only exception being paid time off and any travel that was preapproved by Ripley. Further, Ripley unrealistically demanded (for the first time) that Plaintiff provide a return-on-investment justification for all upcoming trips.

78.    Sinclair also began surreptitiously asking Plaintiff's assistant for Plaintiff's already-approved expense reports with the hopes of finding potential financial misconduct by Plaintiff (which there never was), and terminated Plaintiff's assistant on questionable grounds, even though Tennis Channel was growing, and Plaintiff previously had two extremely busy assistants.

79.    Sinclair asked Plaintiff's assistant, behind his back, for financial records. Sinclair then fired Plaintiff's assistant, only to later ask her to come back for a few weeks.

80.    There is no, and never was any, requirement under the Agreement that Plaintiff perform his duties five days a week, in-person, from Tennis Channel headquarters. Nor would any such requirement make sense or even be possible. In fact, only a very small percentage of Tennis Channel employees are even in the Santa Monica offices during the summer because of the heavy tournament schedule.  They work from home or take their vacation time when not scheduled to work the non-stop summer tournament lineup.

81.    At all times, Plaintiff "principally" performed his duties at Tennis Channel headquarters in California, as required by the Agreement, except when he needed to extensively travel to support Tennis Channel and during the busy sale process.

82.    Moreover, this was the first time that Sinclair began to track or monitor Plaintiff's presence in the office. This too was nonsensical, and is obviously inconsistent with Plaintiff's role, duties and history as President of Tennis Channel.

83.    Given Sinclair's and Ripley's actions, it was clear that Sinclair was trying to set Plaintiff up for failure and attempting to build a pretextual case for his ouster on the eve of Tennis Channel's potential sale.

84.    In or about June of 2024, Smith surprisingly reached out to Plaintiff to discuss Plaintiff's continuing role at Tennis Channel. At one point during their conversations, Smith told Plaintiff that he heard that Plaintiff "checked out", moved his family to Texas and had taken another job. A confused Plaintiff immediately replied that nothing could be further from the truth. At all times, Plaintiff remained dedicated to Tennis Channel's continued

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

success, its potential acquisition, and reasserted his unerring loyalty to the entire Smith family.

85.     Moreover, while Plaintiff owned a property in Texas, it remained uninhabitable and unfurnished.  Plaintiff's primary residence remained in the greater Los Angeles area, and he never resided in Texas until many months after his termination from Tennis Channel.

86.     In or around August 2024, Smith presented Plaintiff with two options in writing: (1) step down to a perfunctory chairman title with no responsibility and token remuneration, if any; or (2) be fired.

87.     At no point did Smith mention any Cause, nor did he provide Plaintiff with the opportunity to cure any purported violations or other conduct that could conceivably constitute Cause. Instead, Smith acknowledged Tennis Channel's outstanding performance and growing EBITDA returns.

88.     Smith's ultimatum and repeated requests for Plaintiff to resign represented yet another reduction of Plaintiff's material duties or authority, and it would otherwise constitute "Good Reason" as it is defined under the Agreement. *See* Ex. A, Sec. 4.1(d).

89.     Plaintiff could have resigned with Good Reason, but instead repeatedly refused Smith's demands to resign because he did not want to quit on Tennis Channel, his colleagues, and the sport. Even in the face of an unjustified potential termination, Plaintiff remained committed to Tennis Channel and its sale process.

90.     Faced with having to make good on its commitment to reward Plaintiff, Sinclair apparently decided Plaintiff would be too expensive to retain. The paradox is of course that

1   it was only through Plaintiff's efforts, according to Smith himself, that the price Tennis

2   Channel would command was now of such elevated value that paying Plaintiff what was

3

4   owed was a material number.

5       91.    On August 26, 2024, concurrently with the start of the U.S. Open, Plaintiff rung

6   the NASDAQ Opening Bell on behalf of Tennis Channel and Sinclair. In his televised

7   speech, which was broadcast on the major television networks and globally, Plaintiff

8   praised and promoted both Tennis Channel and Sinclair. At this time, Plaintiff also held

9

10  numerous meetings at the start of the U.S. Open and in his U.S. Open Stadium Suite.

11      92.    On September 4, 2024, Ripley revealed to Plaintiff over text message that

12  Plaintiff's "exit" would be on Monday, September 9, 2024, further showing that Plaintiff's

13  ouster was preordained. Ripley further forbade Plaintiff from attending any meetings that

14  pertained to Tennis Channel and banned him from Tennis Channel's U.S. Open suite, which

15  pertained to Tennis Channel and banned him from Tennis Channel's U.S. Open suite, which

16  was affectionately known as the "Solomon suite" since Plaintiff negotiated and established

17  the suite years before Sinclair's ownership of Tennis Channel. Sinclair also forced Plaintiff

18  to miss a scheduled meeting with a qualified buyer, FUBO, that same day.

19

20      93.    On September 6, 2024, Sinclair informed Plaintiff that he was terminated,

21  purportedly for Cause, effective September 11, 2024 ("Termination Letter"). In the

22  Termination Letter, "performance of [his] duties is to cease immediately and [he] may no

23  longer hold [him]self out as an officer of Tennis Channel, Inc. or take any action on behalf

24  of the company." Attached as **Exhibit B** is a true and correct copy of the Termination Letter.

25

26      94.    The Termination Letter provides only that Plaintiff is being terminated under

27  Section 4.1(a)(4) of the Agreement, which simply provides the Employment Term ends,

28

among other times, "upon providing notice to Employee, the termination of the Employee's employment by TCI for Cause (as defined in Section 4.1(c) of this Agreement."

95.     However, Plaintiff did not violate any of the for Cause provisions in Section 4.1(c). To be clear:

1.  Plaintiff did not wrongfully appropriate Sinclair's property or money.

2.  Plaintiff was not convicted of a felony, nor was he granted a Probation Before Judgment.

3.  Plaintiff did not disregard his duties and responsibilities, nor did Sinclair provide written notice of such disregard or the reasonable opportunity to correct such disregard if it existed.

4.  Plaintiff did not violate any of Sinclair's policies, nor did Sinclair provide adequate written notice of such violations or the reasonable opportunity to correct such violations if any existed.

5.  Plaintiff did not commit any misconduct or negligence that is reasonably likely to directly or indirectly jeopardize or adversely affect any of STG's or SBG's public or private financings or the public registration of any applicable STG, or SBG capital stock or debt.

6.  Plaintiff was not insubordinate to Sinclair, he did not fail to follow any reasonable directives by Sinclair, nor was he provided adequate written notice of any insubordination or failure to follow reasonable directives.

96.     Sinclair's failure to provide contractually required notice of any alleged problematic behaviors wrongfully denied Plaintiff any opportunity to cure any such alleged

conduct, which conduct was never identified or articulated by Sinclair. Such notice is clearly required by the Agreement.

97.     The Termination Letter is on Sinclair letterhead and states that it is in reference to Plaintiff's employment with The Tennis Channel, Inc. The Termination Letter is signed by David Gibber, who is the Chief Legal Officer at Sinclair, Inc.

98.     The Notice to Employee as to Change in Relationship identified Plaintiff's employer as The Tennis Channel, LLC. This Notice is also signed by David Gibber, who is employed by Sinclair, Inc. as its Executive Vice President and Chief Legal Officer.

**Sinclair Breaches the Agreement by Failing to Pay Plaintiff**

99.     Plaintiff received his final paycheck after his termination date of September 11, 2024. The paycheck was dated September 11, 2024, and it was sent via the United States Postal Service to Plaintiff's California home address (notably, not a Texas address). Sinclair clearly new that Plaintiff was not residing in Texas and still resided in California at that time.

100.     The final paycheck did not include Plaintiff's pro rata portion of his base salary with respect to the current year, his full accrued but unused vacation time, and a separation payment equal to his base salary and the annual Performance Bonus target.

101.     Additionally, Sinclair has failed to pay Plaintiff the remaining, earned equity options that he was owed under the Modified LTIP.

102.     As a result, Sinclair has failed to pay all of Plaintiff's final wages due and owing at the time of his termination.

**Sinclair Breaches the Agreement by Disparaging Plaintiff**

103.    On or around September 5, 2024, prior to Plaintiff's termination and in the middle of the U.S. Open, Sinclair's Chief Legal Officer, David Gibber, made defamatory and disparaging remarks about Plaintiff to the Wall Street Journal.

104.    Specifically, Gibber told the news outlet that Plaintiff moved to Texas, was working for Merit Street Media, and suggested that Plaintiff abandoned Tennis Channel. After the Wall Street Journal published Gibber's remarks, media publications and online outlets all over the world began quoting, reposting and disseminating the article. Given the timing of the hugely embarrassing remarks, and the purposeful inclusion of a headline including national celebrity Dr. Phil McGraw, it was clear that they were made to maximize the reach and thus the damage to Plaintiff.

105.    Then, on or around September 6, 2024, Defendant Ripley communicated disparaging remarks about Plaintiff to various people at the U.S. Open, including those at Tennis Channel's U.S. Open suite.

106.    Specifically, Ripley amplified the prior published inaccuracies about Plaintiff, the circumstances surrounding Plaintiff's termination, and minimized Plaintiff's contributions to Tennis Channel.

107.    Finally, on or around September 16, 2024, Defendant Weisbord made disparaging remarks about Plaintiff to Sports Business Journal, stating: "When Sinclair is writing a check for an employee, we expect 100% of the focus to be on what we're paying them to be and not have multiple focuses."

108.    Weisbord did not disclose that Sinclair previously approved all of Plaintiff's service on other boards and outside business interests, including Merit Street Media. At no

point in time during Plaintiff's employment with Tennis Channel did he have any other employment with any other entity including, but not limited to, Merit Street Media or any affiliate thereof.

109.    These statements about Plaintiff were utterly baseless and unfounded. They suggest that Plaintiff was a disloyal employee to Tennis Channel and Sinclair, which was never the case, as Plaintiff was an evangelist for both organizations until his unwarranted removal.

110.    The remarks directly harmed Plaintiff's personal and professional reputation. Indeed, they were intended to do so.

## **FIRST CAUSE OF ACTION**

### **Wrongful Termination in Violation of Public Policy**

### **(Against Corporate Defendants)**

111.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

112.    It is the public policy of California that an employer may not discharge an employee in order to avoid paying him earned compensation. See *Gould v. Maryland Sound Industries, Inc.* (1985) 31 Cal.App.4th 1137, 1148.

113.    Corporate Defendants and Plaintiff agreed that, under the Modified LTIP, Plaintiff earned all of his phantom equity options and he would receive the remaining fifty percent of his phantom equity options over a period of three years from December 31, 2022, to December 31, 2025.

114.    Corporate Defendants discharged Plaintiff from employment, asserted no reason for Plaintiff's termination, and refused to provide Plaintiff his earned options under the Modified LTIP.

115.    Corporate Defendants' desire to avoid the full and prompt payment of Plaintiff's equity options was a substantial motivating reason for Plaintiff's termination.

116.    As a direct and proximate result of Corporate Defendants' conduct, Plaintiff has suffered substantial economic and noneconomic damages in an amount to be proven at trial.

117.    In doing the things alleged herein, Corporate Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages under California Civil Code § 3294.

## SECOND CAUSE OF ACTION

### Breach of Contract – Failure to Pay Termination Payments

### (Against Corporate Defendants)

118.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

119.    The parties entered into the Agreement, which is a valid and enforceable contract. Through the Agreement, Corporate Defendants agreed to pay Plaintiff certain termination payments if Plaintiff's employment was terminated without Cause.

120.    As described above, Corporate Defendants fabricated Plaintiff's termination

1   as "for Cause," in order to avoid paying Plaintiff the appropriate termination payments.

2   121.    In reality, Plaintiff's employment was terminated without Cause and
3
4   Corporate Defendants have breached the Agreement by improperly failing and refusing to
5   pay Plaintiff the termination payments owed in accordance with the terms of the
6   Agreement.

7   122.    As a direct and proximate result of Corporate Defendants' breach of the
8
9   Agreement, Plaintiff suffered substantial harm in an amount to be proven at trial.

10                        **THIRD CAUSE OF ACTION**
11
12      **Breach of Contract – Failure to Grant Remaining Equity Payments**
13                    **(Against Corporate Defendants)**

14   123.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and
15   every material allegation set out above in the preceding paragraphs as though fully set forth
16
17   herein.

18   124.    As described above Plaintiff and Corporate Defendants entered into the
19   Modified LTIP, which is a valid and enforceable contract.

20   125.    Under the Modified LTIP, Corporate Defendants agreed to award Plaintiff
21
22   phantom equity options. Corporate Defendants would cash out and retire fifty percent of
23   Plaintiff's options at a value of $3.86 million, and would award the remaining fifty percent
24   of his options, which were considered earned, over a period of three years from December
25   31, 2022, to December 31, 2025.
26
27   126.    As described above, Corporate Defendants purported to terminate Plaintiff in
28   order to avoid awarding Plaintiff his remaining, earned equity options.

127.    In reality, the equity options were already earned, and Corporate Defendants were required to award Plaintiff his remaining equity options through December 31, 2025.

128.    Sinclair has breached the Agreement by improperly failing and refusing to award Plaintiff the remaining equity options owed in accordance with the terms of the Modified LTIP.

129.    As a direct and proximate result of Corporate Defendants' breach of the Agreement, Plaintiff suffered substantial harm in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Contract – Disparaging Remarks

### (Against Corporate Defendants)

130.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

131.    The parties entered into the Agreement, which is a valid and enforceable contract.

132.    Through the Agreement, Corporate Defendants agreed to not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning Plaintiff.

133.    Sinclair' Executive Vice President and Chief Legal Officer David Gibber made false, utterly baseless and unfounded comments to Wall Street Journal that threaten Plaintiff's personal and professional reputation.

134.    Sinclair's President and Chief Executive Officer Chris Ripley made false, utterly baseless and unfounded comments to various people at the U.S. Open suite.

135.    Sinclair's Chief Operating Officer and President of Local Media Rob Weisbord made false, utterly baseless and unfounded comments to Sports Business Journal.

136.    Gibber's, Ripley's, and Weisbord's comments threaten Plaintiff's personal and professional reputation, and were intended to do so.

137.    As a direct and proximate result of Corporate Defendants' breaches of the Agreement, Plaintiff suffered substantial harm in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Corporate Defendants)

138.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

139.    Plaintiff and Corporate Defendants are parties to the Agreement dated January 27, 2016 (as subsequently amended), which constitutes a valid and enforceable contract. The parties also entered into a valid contract, the Modified LTIP, with the understanding that Sinclair would sell Tennis Channel.

140.    Under California law, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley v. Interactive Data Corp.,* 47 Cal.

3d 654, 684 (1988) (quoting *Comunale v. Traders & Gen. Ins. Co.,* 50 Cal. 2d 654, 658 (1958)).

141.    Corporate Defendants breached the Agreement's implied covenant of good faith and fair dealing when they terminated Plaintiff without identifying any Cause and/or failing to give him notice and a reasonable opportunity to cure.

142.    Corporate Defendants breached the Agreement's implied covenant of good faith and fair dealing when they relied on the "Sinclair Effect" to manipulate and injure Plaintiff's right to receive the incentive bonuses that he was owed under the Agreement.

143.    Corporate Defendants also breached the Modified LTIP's implied covenant of good faith and fair dealing when Smith initiated Tennis Channel's sham of a sale process, tapped Plaintiff to lead the process, and unjustifiably refused the economically attractive offers that Plaintiff secured.

144.    As a direct and proximate result of Corporate Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff suffered substantial harm in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Failure to Timely Pay Wages Upon Discharge

### (Against Corporate Defendants and Simon)

145.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

146.    California Labor Code § 201(a) provides, in relevant part, that "[i]f an

employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

147.    When Corporate Defendants sent Plaintiff the Termination Letter on September 6, 2024, they prevented him from working, and they knew that he would never be permitted to work for Tennis Channel again. Corporate Defendants therefore discharged Plaintiff on September 6, 2024, the moment it sent the Termination Letter.

148.    Since Plaintiff did not receive his final paycheck until after his discharge date of September 6, 2024, and his purported termination date of September 11, 2024, Corporate Defendants and Simon willfully failed and refused to timely pay all final wages to Plaintiff upon his discharge in violation of California Labor Code § 201(a).

149.    California Labor Code section 203(a) provides, in relevant part, that "[i]f an employer willfully fails to pay, without abatement or reduction, in accordance with §§ 201, 201.3, 201.5, 201.6, 201.8, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

150.    As a result of Corporate Defendants' and Simon's unlawful conduct, Plaintiff is entitled to waiting time penalties of up to 30 days' pay. Additionally, pursuant to California Labor Code §§ 218.5 and 218.6, Plaintiff is entitled to recover the full amount of his unpaid wages, interest thereon, and attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION

**Failure to Pay All Wages Due Upon Discharge**

**(Against Corporate Defendants and Simon)**

151.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

152.    California Labor Code § 201(a) provides, in relevant part, that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

153.    To date, Corporate Defendants and Simon have failed and refused to pay Plaintiff's full accrued and unused vacation time.

154.    Therefore, Corporate Defendants and Simon have willfully failed and refused to timely pay all final wages to Plaintiff upon his discharge in violation of California Labor Code section 201(a).

155.    California Labor Code § 203(a) provides, in relevant part, that "[i]f an employer willfully fails to pay, without abatement or reduction, in accordance with §§ 201, 201.3, 201.5, 201.6, 201.8, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

156.    As a result of Corporate Defendants' and Simon's unlawful conduct, Plaintiff is entitled to waiting time penalties of 30 days' pay. Additionally, pursuant to California Labor Code §§ 218.5 and 218.6, Plaintiff is entitled to recover the full amount of his unpaid wages, interest thereon, and attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION

### Failure to Timely Pay Vested Vacation Time

### (Against Corporate Defendants and Simon)

157.     Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

158.     California Labor Code § 227.3 provides, in relevant part, that "whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served...."

159.     Under Section 3.2 of the Agreement, Plaintiff was entitled to paid vacation leave, but he never took any paid vacation or time off.

160.     Corporate Defendants and Simon have failed to pay Plaintiff his full vested vacation pay at the time of his termination in violation of California Labor § 227.3.

161.     As a result of Corporate Defendants' and Simon's unlawful conduct, Plaintiff is entitled to recover the full amount of his vested and unused vacation pay at the time his employment with Corporate Defendants was terminated, plus interest, attorneys' fees and costs, pursuant to California Labor Code §§ 218.5 and 218.6.

## NINTH CAUSE OF ACTION

### Defamation

### (Against Corporate Defendants, Ripley and Weisbord)

COMPLAINT

162.    Plaintiff hereby restates, re-alleges, and incorporates by reference each and every material allegation set out above in the preceding paragraphs as though fully set forth herein.

163.    In telling Wall Street Journal that Plaintiff moved to Texas, was working for Merit Street Media, and suggested that Plaintiff abandoned Tennis Channel, Gibber implied that Plaintiff was a disloyal, deceitful employee.

164.    In telling various persons at the U.S. Open suite that Plaintiff moved to Texas and was working for Merit Street Media, and suggested that Plaintiff abandoned Tennis Channel, Ripley implied that Plaintiff was a disloyal, deceitful employee.

165.    In telling Sports Business Journal that "When Sinclair is writing a check for an employee, we expect 100% of the focus to be on what we're paying them to be and not have multiple focuses," Weisbord implied that Plaintiff was a disloyal, deceitful employee.

166.    Gibber, Ripley and Weisbord made the remarks within the scope of their employment with Sinclair.

167.    The public statements made by Gibber, Ripley and Weisbord concerning Plaintiff were false. At all times, Plaintiff has devoted all of his energy and efforts to leading Tennis Channel. The statements about Solomon were complete fiction, crafted to seem credible and to cause maximum damage to Plaintiff.

168.    Gibber, Ripley and Weisbord made the above-described defamatory remarks with actual malice, or alternatively, with a reckless disregard for their falsity.

169.    The false statements were made with malice and without privilege or

COMPLAINT

justification. Corporate Defendants were aware of and ratified the statements made by Gibber, Ripley and Weisbord.

170.    The statements are a substantial factor in causing harm to Plaintiff's personal and professional reputation. In addition to suffering harm in an amount of to be proven at trial, the actions of Defendants entitle Plaintiff to an award of punitive damages under California Civil Code § 3294.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

A.    Awarding general and special compensatory damages;

B.    Awarding punitive damages under California Civil Code § 3294;

C.    Awarding statutory penalties pursuant to California Labor Code § 203;

D.    Awarding costs and reasonable attorneys' fees incurred in this action; and

E.    Awarding such other and further relief as the Court deems just and proper.

DATED: August 22, 2025        LAW OFFICES OF VATCHÉ CHORBAJIAN, APC

By:/s/ *Vatche Chorbajian*

Vatche Chorbajian
Attorneys for Plaintiff Kenneth Solomon

1

**DEMAND FOR JURY TRIAL**

2    Plaintiff hereby demands a jury trial on all causes of action set forth in this Complaint.

3

4

5    DATED: August 22, 2025          LAW OFFICES OF VATCHÉ CHORBAJIAN, APC

6

7                                    By:/s/ *Vatche Chorbajian*

8                                    Vatche Chorbajian
                                     Attorneys for Plaintiff Kenneth Solomon

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is entered into this 27th of January 2016 and is effective as of the date that the Acquisition (as defined below) closes (the "Effective Date"), between The Tennis Channel, Inc., a Delaware corporation ("TCI" or the "Employer"), and Kenneth Solomon ("Employee"). Each of the Employer and the Employee, as well as STG and SBG (as both are defined below in the Recitals) are from time-to-time individually referred to in this Agreement as a "Party" and collectively as "Parties".

## RECITALS

A.     TCI is a wholly owned Subsidiary of The Tennis Channel Holdings, Inc., a Delaware corporation ("TCHI") and delivers tennis programming in the form of a cable television channel known as Tennis Channel (the "Channel") to the public throughout the United States and elsewhere over numerous multichannel video program distributors such as cable and satellite companies (each an "MVPD" and collectively "MVPDS").

B.     TCHI is a wholly owned Subsidiary of Sinclair Television Group, Inc., a Maryland corporation ("STG"), which owns or operates television broadcast stations and invests in and/or manages some industry related and non-industry related businesses.

C.     STG is a wholly owned Subsidiary of Sinclair Broadcast Group, Inc., a Maryland corporation ("SBG"), which is a public reporting company and whose Class A and Class B Common shares are traded on the American stock exchange known as the National Association of Securities Dealers Automated Quotations ("NASDAQ") Stock Market.

D.     On or about March 23, 2005, the Employee and TCI entered into an employment Agreement whereby the Employee became the Chairman and Chief Executive Officer of TCI, which agreement was amended on or about December 31, 2009, for the purpose of adding TCHI as a party (such agreement, as amended, the "Existing Employment Agreement")

E.     STG has entered into a purchase agreement to acquire (the "Acquisition") a controlling interest in TCHI.

F.     In connection with the Acquisition, the Employee has agreed to enter into this Agreement and terminate in its entirety the Existing Employment Agreement.

G.     The Parties hereto agree that this Agreement contains all the understandings and agreement(s) by and among them (written and verbal, formal and informal) as of this date in any manner relating to the terms and conditions of Employee's employment, including any prior understandings and agreements, which are and shall be superseded and replaced by this Agreement.

**NOW, THEREFORE, IN CONSIDERATION OF** the mutual promises and covenants herein contained and for other good and valuable consideration, the adequacy and receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     **Duties.**

1

1.1.     *Duties of Employment.* Upon the terms and subject to the other provisions of this Agreement, Employee will be, as of the Effective Date and continuing thereafter, to be employed by TCI as its President. In such capacity, Employee shall (among other assigned duties) periodically (and as directed to do so):

(a)     report to the President and CEO of SBG on all operations, business plans, and business prospects of the Employer and there will not be a CEO of TCI other than the CEO of SBG;

(b)     perform the customary duties and have the customary responsibilities of such a position and perform such duties commensurate therewith as are assigned by the TCI Board of Directors (the "TCI Board") and/or by the President and CEO or CFO of SBG;

1.2.     *Full-Time Employment.* Employee agrees to devote Employee's full working time, attention, and best efforts exclusively to the business of the Employer and its direct and indirect subsidiaries; provided, however, so long as such activities, either individually or in the aggregate, do not interfere with the performance of Employee's duties hereunder as determined by the TCI Board in its reasonable discretion, Employee shall be permitted (i) to continue to serve as non-executive chairman of the board of directors of the cable television channel currently known as Ovation ("Ovation"), and (ii) to serve on civic, educational, charitable, professional, governmental or religious boards or committees, or any other board of directors provided Employee receives prior approval from the TCI Board of Directors. In the event the SBG desires employee to render services beyond the scope of TCI's tennis business, Employer and Employee will negotiate in good faith for additional incentive compensation to Employee.

1.3.     *Location.* During the Employment Term, Employee's services under this Agreement shall be performed principally at the headquarters of the Channel which are presently located in Santa Monica, CA and shall continue to be located within Los Angeles County. The parties acknowledge and agree that the nature of Employee's duties hereunder shall, in any event, require reasonable travel from time to time consistent with travel obligations inherent with the title, duties, and responsibilities of the Employee or as may be from time to time reasonably directed by the TCI Board or the President and CEO of SBG.

2.     **Term.**

2.1.     *Term.* The term of Employee's employment under this Agreement (the "Employment Term") shall begin on the Effective Date and continue until the employment is terminated in accordance with Section 4 of this Agreement.

2.2.     *At Will Employment.* Notwithstanding anything else in this Agreement to the contrary, including, without limitation, the provisions of Section 2.1, Section 3, or Section 4 of this Agreement, the employment of Employee is not for a specified period of time, and TCI or Employee may terminate the employment of Employee with or without Cause (as defined in Section 4.1(c) of this Agreement) at any time for any reason. As of the date of this Agreement, there is not, nor will there be on the Effective Date or at any time in the future,, unless by a writing signed by all of the parties to this Agreement, any express or implied agreement as to the continued employment of Employee.

2

### 3.   Compensation and Benefits.

3.1.   *Compensation.* Subject to the terms of this Agreement, TCI shall compensate Employee in the form of salary and bonus compensation. The Employee's initial annual salary is Six Hundred Twenty-Five Thousand Dollars and No Cents ($625,000.00) (the "Base Salary"), which shall be paid to Employee consistent with Employer's policies in effect from time to time. During each calendar year, any increases to the Base Salary shall be determined by the TCI Board. In addition, Employee shall have the right to earn an annual performance bonus (the "Performance Bonus") up to an amount equal to one hundred percent (100%) of Base Salary. The Performance Bonus will be based on achievement of budgeted targets and a variety of other factors which are performance based (as determined by the TCI Board). Any such Performance Bonus shall be determined and payable only after the TCI Board has had the opportunity to review any information that it determines is necessary, appropriate, or relevant for or to such determination and approval, payable in any event no later than March 31 of the succeeding year. Any changes (increases or decreases) to the Base Salary and/or Performance Bonus may be made in any manner determined by the TCI Board in its sole and compete discretion without altering any other terms of this Agreement. In addition, the Employee will be entitled to an annual bonus based upon the performance of TCI (the "Incentive Bonus") in accordance with Section 8 of this Agreement. Any deferred portion of Employee's total compensation will be controlled by the terms of this Agreement, as may be amended from time to time only by subsequent written agreement(s) that are executed in accordance with this Agreement and in particular Sections 11.8 and 11.14 hereof.

3.2.   *Vacation.* During each calendar year during the Employment Term, Employee shall be entitled to paid vacation leave in an amount equal to the amount otherwise determined in accordance with such policies in effect from time to time at SBG for its senior executive officers of SBG. For purposes of determining Employee's entitlement to vacation and to any and all other employee benefits, Employee's service with TCI shall be treated as service with SBG.

3.3.   *Health Insurance and Other Benefits.* During the Employment Term, Employee shall be eligible to participate in health insurance programs that may from time to time be provided by SBG for its senior executive officers of SBG, and Employee shall be eligible to participate in such other employee benefits plans that may from time to time be provided by SBG to its senior executive officers of SBG.

3.4.   *Tax Issues.* To the extent taxable to Employee, Employee will be responsible for accounting for and payments of taxes on the benefits provided to Employee, and Employee will keep such records regarding uses of these benefits as TCI reasonably requires its other senior executive officers of SBG and will furnish TCI all such information as may be reasonably requested by it with respect to such benefits.

3.5.   *Expenses.* TCI shall reimburse Employee for reasonable travel expenses that are reasonably necessary or appropriate for a business purpose consistent with its other senior executive officers of SBG. Any question as to whether any such travel expense is subject to reimbursement shall be determined by the TCI Board. Employee shall also be reimbursed for all other reasonable business expenses incurred by Employee during the Employment Term on behalf of TCI in accordance with corporate policies established from time to time by TCI and with

3

the prior review and approval by the either the President and CEO of SBG or the TCI Board. Without limiting the generality of the foregoing, any expense reimbursement pursuant to this Section 3.5 shall be subject to Employee supplying to TCI itemized accounts or receipts in accordance with the procedures and policies with respect to reimbursement of expenses in effect from time to time. In addition, Employee will be reimbursed for outside counsel expenses incurred by Employee in negotiating this agreement up to the amount of $20,000.

## 4.   Employment Termination.

### 4.1.   *Termination Events.*

(a)   The Employment Term will end, and the parties will not have any rights or obligations under this Agreement (except for the rights and obligations under those Sections of this Agreement that are continuing and will survive the end of the Employment Term, as specified in Section 11.10 of this Agreement) on the earliest to occur of the following events (each a "Termination Date"):

(1)   the death of Employee;

(2)   the termination of Employment as a result of Employee's Disability (as defined in Section 4.1(b) of this Agreement);

(3)   upon providing notice to Employer, the termination of Employee's employment by Employee without Good Reason (as defined in Section 4.1(d) of this Agreement);

(4)   upon providing notice to Employee, the termination of Employee's employment by TCI for Cause (as defined in Section 4.1(c) of this Agreement);

(5)   upon providing notice to Employee, the termination of Employee's employment by TCI without Cause; or

(6)   the termination of Employee's employment by Employee for Good Reason (as defined in Section 4.1(d) of this Agreement) within three (3) months of the Employee first becoming actually aware of the event giving rise to the Good Reason; provided, however, the Employee has first given the Employer written notice of the Good Reason within ten (10) business days of Employee becoming aware of its occurrence and Employer has not taken action to eliminate the Good Reason within thirty (30) days following receipt of such notice.

(b)   Except as is provided in the last sentence of this Section 4.1(b), for the purposes of this Agreement, "Disability" means Employee's inability, whether mental or physical, to perform the normal duties of Employee's position for ninety (90) days (which need not be consecutive) during any twelve (12) consecutive month period, and the effective date of such Disability shall be the day next following such ninety (90) day. If Employer and Employee are unable to agree as to whether Employee is disabled, the question will be decided by a physician to be paid by Employer and designated by Employer, subject to the approval of Employee (which approval may not be unreasonably withheld) whose determination will be final and binding on the parties. Notwithstanding anything in this Section 4.1(b) or in this Agreement to

4

the contrary, to the extent necessary to prevent a violation of section 409A of the Internal Revenue Code (and any guidance issued thereunder), "Disability" means a medically determinable physical or mental impairment which qualifies Employee for total disability benefits under the Social Security Act and/or which, in the opinion of the Employer (based upon such evidence as it deems satisfactory): (i) can be expected to result in death or to last at least twelve (12) months, and (ii) will prevent Employee from performing any substantial gainful activity.

(c)      For the purposes of this Agreement, "Cause" means any of the following:  (i) the wrongful appropriation for Employee's own use or benefit of property or money entrusted to Employee by Employer, or the Employer or its direct or indirect subsidiaries or parents, (ii) the conviction or granting of a Probation Before Judgment (or similar such finding or determination if not by a Maryland court) of a felony involving moral turpitude, deceit, or fraud, (iii) Employee's continued willful disregard of Employee's duties and responsibilities hereunder after written notice of such disregard and the reasonable opportunity to correct such disregard, (iv) Employee's continued violation of Employer policy after written notice of such violations (such policy may include policies as to drug or alcohol abuse) and the reasonable opportunity to cure such violations, (v) any misconduct or negligence by Employee which is reasonably likely (in the opinion of Employer's outside Corporate or Securities counsel) to directly or indirectly jeopardize or adversely affect any of STG's or SBG's public or private financings or the public registration of any applicable STG, or SBG capital stock or debt; (vi) the continued insubordination of Employee and/or Employee's repeated failure to follow the reasonable directives of the Employer, the President and CEO of SBG, or the TCI Board after written notice of such insubordination or the failure to follow such reasonable directives. Upon a termination for Cause, all of Employee's duties as described in Section 1 of this Agreement shall terminate and the Employee's employment under this Agreement shall cease.

(d)      For purposes of this Agreement, "Good Reason" means any of the following: (i) a more than five percent (5%) reduction in Employee's Base Salary (other than a reduction consistent with a company-wide reduction in pay affecting substantially all executive employees of SBG and its subsidiaries); (ii) a reduction in the material duties or authority of Employee or a material change in Employee's working conditions (which shall be deemed to include any relocation of the headquarters of the Channel beyond the Los Angeles County limits); (iii) any material failure of the successors to Employer to perform or cause the Employer to perform the obligations of the Employer under this Agreement; (iv) any action or inaction of the Employer that constitutes a material breach of the terms of this Agreement after written notice of such breach by Employee to Employer and the reasonable opportunity to correct such breach; or (v) if Employee is no longer TCI's President or no longer reports to the CEO of SBG or TCI Board.

### 4.2.    Termination Payments.

(a)      If Employee's employment is terminated pursuant to Section 4.1(a)(1) (i.e., upon his death) or Section 4.1(a)(2) of this Agreement (i.e., upon his Disability), TCI shall pay to the person or persons designated by Employee pursuant to Section 11.19 (or, if no such written designation has been made, Employee's estate) or to Employee, all of the following:

1.      within thirty (30) days after the Termination Date, the pro rata portion of the Base Salary with respect to the then current year that would have been payable to

5

Employee under Section 3.1 had the Employment Term ended on the last day of the month in which the Termination Date occurs;

2. a payment in respect of unutilized vacation time that has accrued through the Termination Date (determined in accordance with corporate policies established by Employer and consistent with Section 3 of this Agreement);

3. a pro rata share of the Performance Bonus which would have been earned during the year in which the Termination Date occurs based on the portion of such year prior to the Termination Date; and

4. the payment of the Incentive Bonus, if earned, in accordance with Section 8 of this Agreement.

(b) If Employee's employment is terminated pursuant to Section 4.1(a)(3) of this Agreement (i.e., by Employee without Good Reason), TCI shall pay to the Employee within thirty (30) days after the Termination Date, the pro rata portion of the Base Salary due Employee up to and including the Termination Date, along with a payment in respect of unutilized vacation time that has accrued through the Termination Date (determined in accordance with corporate policies established by Sinclair and consistent with Section 3 of this Agreement).

(c) If Employee's employment is terminated pursuant to Section 4.1(a)(4) of this Agreement (i.e., by TCI for Cause), TCI shall pay to Employee within thirty (30) days after the Termination Date, the pro rata portion of the Base Salary due Employee up to and including the Termination Date.

(d) If Employee's employment is terminated pursuant to Section 4.1(a)(5) of this Agreement (i.e., by TCI without Cause) or pursuant to Section 4.1(a)(6) of this Agreement (i.e., by Employee for Good Reason), TCI shall pay Employee all of the following:

1. within thirty (30) days after the Termination Date, the pro rata portion of the Base Salary with respect to the then current year that would have been payable to Employee under Section 3.1 of this Agreement had the Employment Term ended on the last day of the month in which the Termination Date occurs;

2. within thirty (30) days after the Termination Date, a payment in respect of unutilized vacation time that has accrued through the Termination Date (determined in accordance with corporate policies established by Employer and consistent with Section 3 of this Agreement);

3. a Separation Payment equal to the sum of Employee's annual Base Salary (as in effect at the Termination Date or, if higher at any time within the ninety (90) days preceding such Termination Date, such higher Base Salary) and the annual Performance Bonus target during the year in which the Termination Date occurred; and

4. the payment of the Incentive Bonus, if earned, in accordance with Section 8 of this Agreement.

6

## 5.   Confidentiality and Non-Competition.

### 5.1.   *Confidential Information.*

(a)      During Employee's employment hereunder (and at all times thereafter), Employee shall:

(1)      keep all "Confidential Information" (as defined in Section 5.1(b) of this Agreement) in trust for the use and benefit of Employer, STG, SBG, and their direct and indirect subsidiaries (collectively, the "SBG Entities");

(2)      not, except as (i) required by Employee's duties under this Agreement, (ii) authorized by the TCI Board, or the CEO of SBG, or (iii) required by law or any order, rule, or regulation of any court or governmental agency (but only after written notice to Employer of such requirement), at any time during or after the termination of Employee's employment with Employer, directly or indirectly, use, publish, disseminate, distribute, or otherwise disclose any Confidential Information;

(3)      take all reasonable steps necessary, or reasonably requested by any of the SBG Entities, to ensure that all Confidential Information is kept confidential for the use and benefit of the SBG Entities; and

(4)      upon termination of Employee's employment or at any other time any of the SBG Entities in writing so request, promptly deliver to such requesting SBG Entity all materials constituting Confidential Information relating to such SBG Entity (including all copies) that are in Employee's possession or under Employee's control. If requested by any of the SBG Entities to return any Confidential Information, Employee will not make or retain any copy of or extract from such materials.

(b)      For purposes of this Section 5.1, Confidential Information means any proprietary or confidential information of or relating to any of the SBG Entities that is not generally available to the public. Confidential Information includes all information developed by or for any of the SBG Entities (by the Employee or otherwise) concerning marketing used by any of the SBG Entities, suppliers, or customers (including advertisers and MVPDs) with which any of the SBG Entities has dealt prior to the Termination Date, plans for development of new services and expansion into new areas or markets, internal operations, financial information, operations, budgets, and any trade secrets or proprietary information of any type owned by any of the SBG Entities, together with all written, graphic, other materials relating to all or any of the same, and any trade secrets as defined in the Maryland Uniform Trade Secrets Act, as amended from time to time.

### 5.2.   *Non-Competition/Non-Hire/Non-Solicitation.*

(a)      (i) During the Employment Term, and (ii) if Employee's employment is terminated prior to the third anniversary of the Effective Date pursuant to Section 4.1(a)(3) of this Agreement (i.e., by Employee without Good Reason) or pursuant to Section 4.1(a)(4) of this Agreement (i.e., for Cause), then until the third anniversary of the Effective Date,

7

Employee shall not, directly or indirectly, participate in any activity involved in the ownership or operation of (x) any entity that develops and/or in any activity that supplies primarily sports programming to broadcast televisions stations, MVPDS, cable television channels, over-the top providers (as such term is commonly used in the video distribution industry), (y) any cable television network, or (z) similar enterprise anywhere in the United States. If Employee's employment is terminated less than twelve (12) months prior to the third anniversary of the Effective Date pursuant to Section 4.1(a)(3) of this Agreement (i.e., by Employee without Good Reason) or pursuant to Section 4.1(a)(4) of this Agreement (i.e., for Cause), then, in addition to the forgoing restrictions, after the third anniversary of the Effective Date for a period that is equal to twelve (12) months minus the amount of time such termination was before the third anniversary of the Effective Date, Employee shall not directly or indirectly, participate in any activity involved in the ownership or operation of (x) any entity that develops and/or in any activity that supplies tennis programming to broadcast televisions stations, MVPDS, cable television channels, over-the top providers (as such term is commonly used in the video distribution industry) or (y) similar enterprise anywhere in the United States. If (i) Employee's employment is terminated pursuant to Section 4.1(a)(3) of this Agreement (i.e., by Employee without Good Reason), pursuant to Section 4.1(a)(4) of this Agreement (i.e., for Cause), or (ii) Employee's employment is terminated after the third anniversary of the Effective Date pursuant to Section 4.1(a)(5) of this Agreement (i.e., by TCI without Cause), or pursuant to Section 4.1(a)(6) of this Agreement (i.e., by Employee for Good Reason), Employee shall not, for a period of twelve (12) months after termination, directly or indirectly, participate in any activity involved in the ownership or operation of (x) any entity that develops and/or in any activity that supplies primarily tennis programming to broadcast televisions stations, MVPDS, cable television channels, over-the top providers (as such term is commonly used in the video distribution industry) or (y) similar enterprise anywhere in the United States. Provided, that the foregoing restriction shall not apply to restrict Employee from continuing to serve as the non-executive chairman of the board of Ovation. As used herein, "participate" means lending one's name to, acting as a consultant or adviser for, being employed by, or acquiring any direct or indirect interest in any business or enterprise, whether as a stockholder, partner, officer, director, employee, consultant, or otherwise. The parties acknowledge and agree that this Agreement and the obligations set forth in this Section 5.2 are a condition to the closing of, and an essential portion of the consideration provided to STG to enter into, the Acquisition pursuant to which Employee will receive substantial consideration and that the scope, duration and geographic area of the restrictions in this Section 5.2 have been negotiated for in good faith and are reasonable restrictions.

(b)     While employed by Employer, and for twelve (12) months thereafter (regardless of the reason why Employee's employment is terminated), Employee will not directly or indirectly:

(1)     hire, attempt to hire, or to assist any other person or entity in hiring or attempting to hire any employee of any of the SBG Entities or any person who was an employee of any of the SBG Entities within the prior twelve (12) months period; ; provided, however, that the foregoing provision of this Section 5.2(b) shall not restrict (i) any general solicitation for employment that is not specifically directed at employees of any SBG Entity or any of its affiliates or (ii) any solicitation of any person referred by a third-party search agency through a general search not targeted at employees of any SBG Entity or any of its affiliates; or

                    (2)     solicit, in competition with any of the SBG Entities, the business of any customer of any of the SBG Entities or any entity whose business any of the SBG Entities solicited during the twelve (12) months period prior to Employee's termination.

                    (c)     Notwithstanding anything else contained in this Section 5.2, (i) Employee may at any time own, for investment purposes only, up to five percent (5%) of the stock of any publicly-held corporation whose stock is either listed on a national stock exchange or on the NASDAQ if Employee is not otherwise affiliated with such corporation.

                    (d)     In the event that (i) TCI, TCIII, STG or SBG is sold within twelve (12) months after termination of Employee's employment hereunder, or (ii) Employee's employment is terminated in connection with the disposition of all or substantially all of the assets of TCI or TCHI (whether by sale of assets, equity, or otherwise), Employee agrees to be bound by, and to execute such additional instruments as may be necessary or desirable to evidence Employee's agreement to be bound by, the terms and conditions of any non-competition provisions contained in the purchase and sale agreement for such stations, without receiving any consideration therefore beyond that expressed in this Agreement. Notwithstanding the foregoing, in no event shall Employee be bound by, or obligated to enter into, any non-competition provisions referred to in this Section 5.2 that extend beyond twelve (12) months from the date of termination of Employee's employment hereunder or whose scope extends the scope of the non-competition provisions set forth in Section 5.2(a) of this Agreement.

                    (e)     The twelve (12) month time period referred to in this Section 5.2 of this Agreement shall be tolled on a day-for-day basis for each day during which Employee participates in any activity in violation of Section 5.2 of this Agreement so that Employee shall be restricted from engaging in the conduct referred to in Section 5.2 of this Agreement for a full twelve (12) months.

        5.3.    *Non-Disparagement.* Each Party agrees and covenants that they will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the other Party (and in the case of TCI and TCHI its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors, direct and indirect owners, and other associated, affiliated, and related third parties). This does not, in any way, restrict or impede a Party hereto from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order. Each Party shall promptly provide written notice of any such order to the other Party.

        5.4.    *Acknowledgment.* Employee acknowledges and agrees that this Agreement (including, without limitation, the provisions of Sections 5 and 6 of this Agreement) is a condition of Employee being employed by TCI, Employee having access to Confidential Information, being eligible to receive the items referred to in Section 3 of this Agreement, Employee's advancement at TCI, and Employee being eligible to receive other special benefits at TCI; and further, that this Agreement is entered into, and is reasonably necessary, to protect the SBG Entities' investment in the Employee's training and development, and to protect the goodwill, trade secrets, business practices, and other business interests of the SBG Entities.

## 6.    Remedies.

6.1.    *Injunctive Relief.*  The covenants and obligations contained in Section 5 of this Agreement relate to matters which are of a special, unique, and extraordinary character, and a violation of any of the terms of such Section will cause irreparable injury to the SBG Entities, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, the SBG Entities will be entitled to an injunction, a restraining order, or other equitable relief from any court of competent jurisdiction (subject to such terms and conditions that the court determines appropriate) restraining any violation or threatened violation of any of such terms by Employee and such other persons as the court orders. The Parties acknowledge and agree that judicial action, rather than arbitration, is appropriate with respect to the enforcement of the provisions of Section 5 of this Agreement. The forum for any litigation hereunder shall be the Circuit Court of Baltimore County or the United States District Court (Northern Division) sitting in Baltimore, Maryland.

6.2.    *Cumulative Rights and Remedies.*  Rights and remedies provided by Section 5 of this Agreement are cumulative and are in addition to any other rights and remedies any of the SBG Entities may have at law or equity.

6.3.    *Damages for Non-Competition Breach.*  If Employee breaches its obligation under Section 5.2 of this Agreement, Employer shall have the right to either (i) enforce its rights thereunder by a decree of specific performance, temporary, preliminary and/or permanent injunctive relief, or (ii) require Employee to promptly pay Employer $500,000 (the "Liquidated Damages Amount"). In the event of such breach, Employer shall, in addition, be entitled to prompt payment on demand from Employee of the reasonable attorneys' fees and costs incurred by them in enforcing their rights under this Agreement. Employee acknowledges and agrees that the payment of the Liquidated Damages Amount as set forth herein shall constitute payment of liquidated damages and not a penalty and that such Liquidated Damages Amount is reasonable in light of the substantial but indeterminate harm anticipated to be caused by Employee's material breach or default under this Agreement, the difficulty of proof of loss and damages, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy and the value of the transactions to be consummated hereunder. For the avoidance of doubt, the parties hereto expressly acknowledge and agree that this Section 6.3 in no way limits or restricts Employer's ability to exercise their rights pursuant to 6.1 or 6.2 at any time. 

7.    **Absence of Restrictions.**  Employee warrants and represents that Employee is not a party to or bound by any agreement, contract, or understanding, whether of employment or otherwise, with any third person or entity which would in any way restrict or prohibit Employee from undertaking or performing employment with TCI in accordance with the terms and conditions of this Agreement.

## 8.    Incentive Bonus.

8.1.    *Definitions.*  As used in this Section 8, the following terms have the meanings respectively set forth after each one:

        (a)    "EBITDA" shall mean the earnings before interest, taxes, depreciation and amortization of TCI for any calendar year, determined in accordance with generally accepted accounting principles consistently applied.

        (b)    "Sinclair Effect" shall mean the impact on subscription revenue (i.e., fees received from MVPDs for the right to carry the Channel) as a result of new carriage of the Channel or any increased penetration of the Channel on any MVPD as a result of distribution contracts (or amendments thereto) negotiated by SBG prior to the Acquisition or by SBG or TCI during the first twenty four (24) months after the date of the Acquisition, resulting from the Acquisition and TCI (thereafter) being a subsidiary and/or an affiliated of STG and SBG, as determined in SBG's and STG's sole, but reasonable, discretion.

        8.2.    Subject to adjustment as provided for in Sections 8.2(a),8.2(b), and 8.2(c) below and as set forth in Section 8.3 below, Employee shall be entitled to an annual Incentive Bonus during the Employment Term in an amount equal to one and ninety-six hundredths percent (1.96%) of the difference between (i) eight (8) times EBITDA for the calendar year with respect to which such Incentive Bonus is being paid (the "Value Amount"), and (ii) eight (8) times EBITDA for the calendar year immediately prior to the calendar year with respect to which such Incentive Bonus is being paid. The Incentive Bonus during the first calendar year of the Employment Term shall be prorated to take into account the portion of such calendar year included in the Employment Term.

        (a)    The EBITDA for all years (and partial years) applicable to the calculation of any Incentive Bonus shall be reduced by the Sinclair Effect.

        (b)    If EBITDA for any calendar year during the Employment Term is less than EBITDA for the immediately prior calendar year , such shortfall shall be multiplied by eight (8) and then further multiplied by one and ninety-six hundredths percent (1.96%) (the result of which shall be referred to as the "Adjustment Amount"). Any Incentive Bonus to which Employee would have been otherwise entitled shall be reduced by the Adjustment Amount until the Adjustment Amount has been reduced to zero, with such reductions applied first to the next Incentive Bonus payable to Employee after the Adjustment Amount has come into effect, and if in excess of such Incentive Bonus, thereafter applied against each succeeding Incentive Bonus due to Employee.

        (c)    If TCIH, TCI or SBG makes an acquisition related to the Channel, then, (i) for purposes of calculating the Incentive Bonus for the year that such acquisition occurs the EBITDA shall not include the earnings relating to the acquisition, and (ii) for purposes of calculating the Incentive Bonus for the year that follow such acquisition and thereafter, the EBITDA for such year and the previous year shall include the earnings (and pro forma for a full year if so required) relating to the acquisition.

        8.3.    Except as provided in Section 8.5, the first annual Incentive Bonus will be paid, if any, on the date which is four (4) years following the end of the first calendar year for which such Incentive Bonus is computed and each other annual Incentive Bonus will be paid if any, on the date which is three (3) years following the end of the calendar year for which such Incentive Bonus is computed, provided that Employee is still employed by TCI on the date on which such Incentive Bonus is payable. For example, the Incentive Bonus payable for the 2017

calendar year, if any, will be paid on December 31, 2021 (assuming such year is the first year for which such Incentive Bonus is computed) if Employee is still employed by TCI on December 31, 2021 and the Incentive Bonus payable for the 2018 calendar year, if any, will be paid on December 31, 2021 if Employee is still employed by TCI on December 31, 2021. The Parties agree that, except as otherwise provided in Section 8.5, continued employment through the date on which any Incentive Bonus is payable is a condition precedent of such Incentive Bonus actually being earned.

8.4.   Each Incentive Bonus may be paid, at SBG's sole election, either in cash or in registered, unrestricted SBG stock, valued at the average of closing prices for the ten (10) trading days immediately preceding the payment date.

8.5.   Notwithstanding the provisions of Section 8.3, if Employee's employment is terminated prior to the date on which any Incentive Bonus is payable to Employee, such Incentive Bonus payable to Employee shall be adjusted in accordance with the provisions of this Section 8.5.

(a)   If the termination of Employee's employment occurs by Employee without Good Reason or by Employer for Cause, any unpaid Incentive Bonus shall be forfeited by Employee.

(b)   If Employee's employment terminates by reason of Employee's death or Disability, by Employer without Cause, or by Employee for Good Reason, each Incentive Bonus relating to the year in which the Termination Date occurs (prorated based on the portion of the year which occurred prior to the Termination Date) or any year prior thereto which has not previously been paid to Employee shall be due and payable to Employee or Employee's estate, subject to the adjustments in Section 8.2, notwithstanding that Employee is no longer employed by TCI on the date which is three (3) or four (4) years, as applicable, following the end of the calendar year for which such Incentive Bonus is computed.

## 9.   Proprietary Rights.

9.1.   *Work Product.*   Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by Employee individually or jointly with others during the period of his employment by TCI and relating in any way to the business or contemplated business, research or development of the TCI or any SBG Entity (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof (collectively, the "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), mask works, patents and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions and renewals thereof (collectively, the "Intellectual Property Rights"), shall be the sole and exclusive property of Employer. For purposes of this Agreement, Work Product includes, but is not limited to, SBG Entity group information,

12

including plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations know-how, computer programs, computer applications, software design, web design, work in process, databases, manuals, results, developments, reports, graphics, drawings, sketches, market studies, formulae, notes, communications, designs, styles, models, audiovisual programs, inventions, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, client information, customer lists, client lists, marketing information, advertising information, and sales information.

9.2.    *Work Made for Hire; Assignment.*    Employee acknowledges that, by reason of being employed by TCI at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by TCI and TCHI. To the extent that the foregoing does not apply, Employee hereby irrevocably assigns to Employer, for no additional consideration, Employee's entire right, title and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit Employer's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that TCI would have had in the absence of this Agreement.

9.3.    *Further Assurances; Power of Attorney.*    During and after his employment, Employee agrees to reasonably cooperate with Employer to (a) apply for, obtain, perfect and transfer to the Employer the Work Product as well as an Intellectual Property Right in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, executing and delivering to Employer any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as shall be requested by Employer. Employee hereby irrevocably grants Employer power of attorney to execute and deliver any such documents on Employee's behalf in his name and to do all other lawfully permitted acts to transfer the Work Product to Employer and further the transfer, issuance, prosecution and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if Employee does not promptly cooperate with Employer's request (without limiting the rights Employer shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be affected by Employee's subsequent incapacity.

9.4.    *No License.*    Employee understands that this Agreement does not, and shall not be construed to, grant Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software or other tools made available to him by Employer.

10.    **Security.**    Employee agrees and covenants (a) to comply with all Employer security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, Employer intranet, internet, social media and instant messaging systems, computer systems, e-mail systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords, and any and all other

13

Employer resources and communication technologies (collectively, the "Facilities Information Technology and Access Resources"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Employer; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Employee's employment by Employer, whether termination is voluntary or involuntary. Employee agrees to notify Employer promptly in the event he learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or tampering with any Facilities and Information Technology Access Resources or other SBG Entity property or materials by others.

## 11.    Miscellaneous.

11.1.   *Attorneys' Fees.*   In any action, litigation, arbitration, or proceeding (collectively, "Action") between the Parties arising out of or in relation to this Agreement, the prevailing Party in the Action will be awarded, in addition to any damages, injunctions, or other relief, and without regard to whether such Action is prosecuted to final appeal, such Party's costs and expenses, including reasonable attorneys' fees.

11.2.   *Headings.*   The descriptive headings of the Sections of this Agreement are inserted for convenience only, and do not constitute a part of this Agreement.

11.3.   *Notices.*   All notices and other communications hereunder shall be in writing and shall be deemed given upon (a) oral or written confirmation of a receipt of a facsimile transmission, (b) confirmed delivery of a standard overnight courier or when delivered by hand, or (c) the expiration of five (5) business days after the date mailed, postage prepaid, to the Parties at the following addresses:

| | |
|---|---|
| If to Employer to: | The Tennis Channel, Inc. |
| | c/o Sinclair Broadcast Group, Inc. |
| | 10706 Beaver Dam Road |
| | Cockeysville, Maryland 21030 |
| | Attn:  Chief Executive Officer |
| | Facsimile: (410) 568-1533 |
| | |
| With a copies to: | Barry M. Faber, Esq., |
| | Executive Vice President, |
| | General Counsel |
| | Sinclair Broadcast Group, Inc. |
| | 10706 Beaver Dam Road |
| | Cockeysville, Maryland 21030 |
| | Facsimile: (410) 568-1537 |

14

<table>
<tr><td>If to Employee to:</td><td>Employee's address as listed<br>from time-to-time, in the<br>personnel records of<br>TCI (or any affiliate thereof)</td></tr>
<tr><td>With a copy to:</td><td>Ken Ziffren<br>1801 Century Park West<br>Los Angeles, CA 90067</td></tr>
</table>

or to such other address as will be furnished in writing by any Party. Any such notice or communication will be deemed to have been given as of the date so mailed.

11.4. *Assignment.* Except as otherwise provided in Section 5.2(d), Employer may not assign, transfer, or delegate its rights or obligations under this Agreement and any attempt to do so is void; provided, Employer may assign this Agreement to any subsidiary or parent of Employer; provided such assignment shall not relieve Employer of its obligations hereunder, and Employee hereby consents and agrees to be bound by any such assignment by Employer. Employee may not assign, transfer, or delegate Employee's rights or obligations under this Agreement and any attempt to do so is void. This Agreement is binding on and inures to the benefit of the Parties, their successors and assigns, and the executors, administrators, and other legal representatives of Employee. Except as otherwise provided in Section 5.2(d), no other third parties, other than SBG Entities, shall have, or are intended to have, any rights under this Agreement.

11.5. *Counterparts.* This Agreement may be signed in one or more counterparts.

11.6. *Governing Law.* **THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MARYLAND (REGARDLESS OF THE LAWS THAT MIGHT BE APPLICABLE UNDER PRINCIPLES OF CONFLICTS OF LAW) AS TO ALL MATTERS (INCLUDING VALIDITY, CONSTRUCTION, EFFECT, AND PERFORMANCE), PROVIDED THIS IS CONSISTENT WITH OTHER SENIOR EXECUTIVE OFFICERS OF SBG.**

11.7. *Severability.* If the scope of any provision contained in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by law, and Employee hereby consents that such scope may be reformed or modified accordingly and enforced as reformed or modified in any proceeding brought to enforce such provision. Subject to the immediately preceding sentence, whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision, to the extent of such prohibition or invalidity, shall not be deemed to be a part of this Agreement, and shall not invalidate the remainder of such provision or the remaining provisions of this Agreement.

11.8. *Entire Agreement.* This Agreement constitutes the entire agreement of Employee and Employer regarding Employee's employment by TCI. This Agreement amends, supersedes, and replaces all prior agreements and understandings, written or verbal, formal or informal, among the Parties with respect to the employment of Employee by TCI, including the

subject matter of this Agreement. This Agreement may not be amended or modified except by agreement in writing, signed by the Party against whom enforcement of any waiver, amendment, modification, or discharge is sought.

11.9. *Interpretation.* This Agreement is being entered into among competent and experienced businessmen (who have had an opportunity to consult with counsel), and any ambiguous language in this Agreement will not necessarily be construed against any particular Party as the drafter of such language.

11.10. *Continuing Obligations.* The provisions contained in the following Sections of this Agreement will continue and survive the termination of this Agreement: Sections 4.1, 4.2, 5, 6, 8, 9 and 11.

11.11. *Taxes.* Employer may withhold from any payments under this Agreement all applicable federal, state, city, or other taxes required by applicable law to be so withheld.

**11.12.** *Waiver of Jury Trial.* **TCI AND EMPLOYEE DO HEREBY JOINTLY AND SEVERALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH BOTH ARE PARTIES ARISING OUT OF, OR IN ANY MANNER PERTAINING TO, THIS AGREEMENT. IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER CONSTITUTES A WAIVER OF THE RIGHT TO TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS. THIS WAIVER IS KNOWINGLY, VOLUNTARILY, AND WILLINGLY MADE BY EMPLOYEE AND TCI, AND EACH REPRESENTS AND WARRANTS TO THE OTHER THAT NO REPRESENTATIONS OF FACTS OR OPINION HAVE BEEN MADE BY ANY PERSON TO INDUCE THIS WAIVER OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. STILL FURTHER, EMPLOYEE AND TCI EACH REPRESENTS TO THE OTHER THAT EACH HAS BEEN REPRESENTED BY COUNSEL SELECTED BY SUCH PARTY TO REVIEW OR PREPARE THIS AGREEMENT OR, IF NOT REPRESENTED, THAT SUCH PARTY HAS BEEN ADVISED, AND HAS HAD THE OPPORTUNITY, TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL TO REVIEW THIS AGREEMENT PRIOR TO SIGNING THIS AGREEMENT.**

11.13. *Exclusion from ERISA and Retirement and Fringe Benefit Computation.* Employee and Employer do hereby jointly and severally acknowledge and agree that this Agreement shall not be regarded as an "employee benefit plan" under 29 U.S.C. § 1002(3); provided, however, that if this Agreement is ever regarded as an "employee benefit plan" under 29 U.S.C. § 1002(3), Employee and Employer acknowledge and agree that this Agreement shall be regarded as a plan which is unfunded and is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees under 29 U.S.C. § 1051(2). Unless specifically provided otherwise pursuant to a separate plan or agreement, any payment of the Special Incentive Bonus under this Agreement shall not be taken into account as "wages," "salary" or "compensation" in determining eligibility or benefits under (i) any pension, retirement, profit sharing or other qualified or nonqualified plan of deferred compensation, (ii) any employee welfare or fringe benefit plan, including, but not limited to, group life insurance and disability, or (iii) any form of extraordinary pay, including, but not limited to, bonuses, sick pay, and vacation pay.

16

11.14. *Section 409A Compliance.* This Agreement may not be amended in any way that results in a violation of section 409A of the Internal Revenue Code or any regulatory or other guidance issued by the Internal Revenue Service thereunder. In particular, except to the extent permitted by regulatory or other guidance issued by the Internal Revenue Service under section 409A(a)(3) of the Internal Revenue Code, no amendment of this Agreement shall in any way (including a change in form of distribution) result in acceleration of the timing or amount of any payment (or any portion thereof) of deferred compensation that is due under this Agreement. An amendment that permits acceleration for any one or more of the reasons that constitute exceptions to the prohibition on acceleration of payments, pursuant to Treas. Regs. § 1.409A-3(j) (as presently written or as hereafter amended, finalized, replaced or supplemented), shall not be deemed to be in violation of this Section 9.14. Notwithstanding any provision of this Agreement to the contrary, if at the time of payment of any Incentive Bonus pursuant to Section 8 of this Agreement, Employee is regarded as a "specified employee" within the meaning of section 409A(a)(2)(B) of the Code and the regulations promulgated thereunder, he may not receive any payment(s) of "deferred compensation" upon any "separation from service" as determined by TCI in accordance with section 409A(a)(2)(A)(i) of the Internal Revenue Code and the regulations promulgated thereunder, unless such payment(s) are made on or after the date that is six months after the date of such separation from service (or if earlier, the date of death of such specified employee.) Instead, any such payments to which such specified employee would otherwise be entitled during the first six (6) months following such separation from service shall be accumulated and paid on the first day of the seventh month following the date of separation from service.

11.15. *No Right to Employment.* Nothing herein contained is intended to or shall be construed as conferring upon Employee any right to continue in the employ of Employer.

11.16. *Enforcement.* The location of any arbitration regarding this Agreement shall be Baltimore County, Maryland. The forum for any litigation involving this Agreement shall be the Circuit Court of Baltimore County or the United States District Court (Northern Division) sitting in Baltimore, Maryland, provided this is consistent with other senior executive officers of SBG.

11.17. *Independent Legal Counsel.* The undersigned understand and acknowledge that this Agreement was prepared by counsel for Employer. The undersigned understand that Employee and Employer may be adverse to each other regarding terms and conditions set forth in this Agreement. The undersigned acknowledge that counsel to Employer has not represented Employee in connection with the preparation of this Agreement nor provided Employee with any legal or other advice in connection with this Agreement and that Employee has been advised and urged to seek independent professional legal, tax, and financial advice in connection with deciding to enter into this Agreement.

11.18. *Arbitration and Extension of Time.* **EXCEPT AS SPECIFICALLY PROVIDED IN SECTION 6 OF THIS AGREEMENT, ANY DISPUTE OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE DETERMINED AND SETTLED BY ARBITRATION IN BALTIMORE COUNTY, MARYLAND IN ACCORDANCE WITH THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION THEN IN EFFECT, AND THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1 ET SEQ., AND JUDGMENT UPON THE AWARD**

17

RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION. THE EXPENSES OF THE ARBITRATION SHALL BE BORNE BY THE NON-PREVAILING PARTY TO THE ARBITRATION, INCLUDING, BUT NOT LIMITED TO, THE COST OF EXPERTS, EVIDENCE, AND LEGAL COUNSEL, AS DETERMINED BY THE ARBITRATOR(S) IN ANY SUCH PROCEEDING. WHENEVER ANY ACTION IS REQUIRED TO BE TAKEN UNDER THIS AGREEMENT WITHIN A SPECIFIED PERIOD OF TIME AND THE TAKING OF SUCH ACTION IS MATERIALLY AFFECTED BY A MATTER SUBMITTED TO ARBITRATION, SUCH PERIOD SHALL AUTOMATICALLY BE EXTENDED BY THE NUMBER OF DAYS, PLUS TEN (10) THAT ARE TAKEN FOR THE DETERMINATION OF THAT MATTER BY THE ARBITRATOR(S).   NOTWITHSTANDING THE FOREGOING, THE PARTIES AGREE TO USE THEIR BEST REASONABLE EFFORTS TO MINIMIZE THE COSTS AND FREQUENCY OF ARBITRATION HEREUNDER.

11.19. *Payment to Beneficiaries and Beneficiary Designation.*

(a)   In the event of Employee's death at a time when Employee is entitled to receive but has not yet received any cash payments pursuant to this Agreement, any such remaining payments shall be paid to Employee's beneficiaries.

(b)   Simultaneously with the execution of this Agreement, Employee shall designate one or more beneficiaries to receive the cash payments referred to in Section 11.19(a) of this Agreement. Such beneficiary designation shall be set forth in *Exhibit A* attached hereto and made a part hereof, and may be modified by Employee at any time, and from time to time, by execution of a new *Exhibit A*. Each designation of beneficiary will revoke all prior designations by Employee.

(c)   If the primary beneficiaries named by Employee die before Employee, and there are no living contingent beneficiaries named by Employee, Employer shall direct distribution of the cash payments payable pursuant to this Agreement to the legal representative of the estate of Employee.

11.20. *Payments to Minors.* If any person to whom any cash payment is due under this Agreement is a minor, or is reasonably found by Employer to be incompetent by reason of physical or mental disability, Employer shall have the right to cause such payments becoming due to such person to be made to another for his benefit, without responsibility of Employer to see to the application of the payment of any such payments, and such payment will constitute a complete discharge of the liabilities of Employer with respect thereto.

11.21. *Publicity. Employee hereby irrevocably consents to customary* uses and displays, by any SBG Entity and its agents, representatives and licensees (consistent with such SBG Entity's use of similar information of other executives of such SBG Entity), of Employee's name, voice, likeness, image, appearance and biographical information (collectively, "Likeness") in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising and publicity, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes and all other printed and electronic forms and media throughout the world, at any time during the period of his employment by the Employer, for all legitimate commercial and business purposes of Employer

18

("Permitted Uses") without further consent from or royalty, payment or other compensation to Employee. Employee hereby forever waives and releases all SBG Entities and their respective directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of his employment by Employer, arising directly or indirectly from SBG Entity's and their respective agents', representatives', and licensees' exercise of their rights in connection with any Permitted Uses. Upon the termination of this Agreement, SBG Entity shall not use, without Employee's consent, any of Employee's Likeness that is directly related to the marketing of the Channel after the termination of this Agreement.

## *[THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.]*

## *[THE SIGNATURES OF THE PARTIES APPEAR ON THE IMMEDIATELY FOLLOWING PAGE]*

19

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first written above.

THE TENNIS CHANNEL HOLDING COMPANY, INC (ON BEHALF OF ITSELF AND ITS WHOLLY OWNED SUBSIDIARY THE TENNIS CHANNEL INC.)

By:

Name:

Title:

EMPLOYEE:

Kenneth Solomon

20

# SINCLAIR

David Gibber
Executive Vice President and
Chief Legal Officer
Direct Dial 410.568.1693
DGibber@sbgtv.com

September 6, 2024

*VIA UPS and email – ksolomon2121@gmail.com*

Kenneth Solomon
784 Ocampo Drive
Pacific Palisades, CA 90272

Mr. Solomon:

Reference is made to your Employment Agreement with The Tennis Channel, Inc. dated January 27, 2016 ("Employment Agreement"). Any capitalized term used herein and not defined shall have the meaning given to it in the Employment Agreement.

The purpose of this letter is to inform you that your employment is being terminated for Cause pursuant to Section 4.1(a)(4) of the Employment Agreement. The effective date of termination will be September 11, 2024 so that the company can process your final paycheck, however, performance of your duties is to cease immediately and you may no longer hold yourself out as an officer of The Tennis Channel, Inc. or take any action on behalf of the company.

Please advise us within 24 hours if you want your final pay to be processed as a direct deposit. If we do not hear from you, your final pay will be distributed in the form of a check and will be mailed to you at the address above.

You are hereby directed to return all Confidential Information and equipment owned by the company on or before Monday, September 9, 2024, which includes, but is not limited to, your company-issued cell phone and computer. Further, effective immediately, you may not access any Facilities Information Technology and Access Resources, which includes entering the company's premises. If you have personal belongings in the office, please notify me so that I can arrange for you to receive the items.

Further, this letter shall serve as a formal reminder of the provisions in the Employment Agreement regarding Non-Disparagement, Confidentiality and Non-Competition, and the Hold Notice to Preserve Documents & Materials that was sent to you via counsel on September 6, 2024, and the obligations contained therein.

Lastly, this letter is being sent via UPS to the last address we have on record for you but it is our understanding that you have moved; therefore, we are asking your counsel (shown in the cc below) to forward this letter to you.

# SINCLAIR

We reserve all rights.

Sincerely,

*David Gibber*

David Gibber
Executive Vice President and
Chief Legal Officer

Enclosures:
Notice to Employee as to Change in Relationship
Summary of Payroll and Benefits Information for Exiting Employees
For Your Benefit:  California's Programs for the Unemployed

cc:    Christopher S. Ripley, President and CEO
       Amanda A. Sonneborn, Esquire (*via UPS and email – asonneborn@kslaw.com*)
       Kenneth Ziffren, Esquire (*via UPS and email – kenz@ziffrenlaw.com*)